1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

KRISTINA RAE DEAN,

           Plaintiff,

   v.

MICHAEL ASTRUE,
Commissioner of Social Security,

          Defendant.
_____/

CASE NO. 1:10-cv-00523-SMS

ORDER AFFIRMING AGENCY'S
DENIAL OF BENEFITS AND ORDERING
JUDGMENT FOR COMMISSIONER

Plaintiff Kristina Rae Dean seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits under Title II, and for supplemental security income pursuant to Title XVI, of the Social Security Act (42 U.S.C. § 301 *et seq.)* (the "Act"). The matter is currently before the Court on the parties' cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder, United States Magistrate Judge.[1] Following a review of the complete record and applicable law, this Court finds the decision of the Administrative Law Judge ("ALJ") to be supported by substantial evidence in the record as a whole and based on proper legal standards. Accordingly, this Court denies Plaintiff's appeal.

///

///

_____

[1] Both parties consented to the jurisdiction of a United States Magistrate Judge (Docs. 6 & 9).

# I.   Administrative Record

## A.   Procedural History

On December 5, 2005, Plaintiff protectively filed an application under both Title II and Title XVI for a period of disability, disability insurance benefits, and supplemental security income (SSI) for a disability beginning December 29, 2005. The claims were denied initially on August 25, 2006, and upon reconsideration on May 17, 2007.  Plaintiff requested a hearing on May 29, 2007.

Plaintiff appeared and testified at a hearing on January 3, 2008.  In a decision dated April 17, 2008, Administrative Law Judge Laura Speck Havens denied Plaintiff's application.   On January 22, 2010, the Appeals Council affirmed the ALJ's decision.  On March 24, 2010, Plaintiff filed her complaint in this Court.

## B.   Factual Record

Plaintiff (born June 10, 1977) graduated from high school and completed about three years of college through part-time attendance.  She worked at a series of entry-level positions including retail clerk, waitress, restaurant hostess, customer service clerk, deli clerk, and receptionist.  Although she applied for disability benefits in December 2005, she continued working at least through November 2006, earning $10,366.45 in 2006.

In a work activity report of employment since December 29, 2005, completed by Plaintiff on May 18, 2006, Plaintiff reported that she worked an average of 30 hours per week at Bed, Bath & Beyond in Salt Lake City, Utah, from March through May 2006, earning $8.50 per hour, before returning to California for an unspecified family emergency.  Before that, she worked 35 to 40 hours a week at WalMart in Sonora, California, earning $8.80 per hour.  Plaintiff reported that she left both these jobs for reasons other than her medical condition.  (Plaintiff appears to have left WalMart to move to Utah and then to have left Bed Bath & Beyond to return to California due to the "family emergency.")  Following her return to California, Plaintiff returned to Walmart.  From January through May 2006, Plaintiff reported earning $4,000.  At that point, the agency permitted Plaintiff's application to proceed for earnings below the limit for substantial gainful employment.

1    In an undated adult disability report (completed after December 2005 and before a

2  psychiatric appointment scheduled in March 2006), Plaintiff reported that she quit work on

3  December 29, 2005, because she "had a breakdown."  AR 99.  Nothing in the agency record

4  documents treatment of any type for a "breakdown" at that time.

5    In her hearing testimony, Plaintiff had no explanation for initially selecting December 29,

6  2005, as her disability date.  She testified that she had worked at Walmart for three months and

7  left in August 2006.  Thereafter, she had only "sporadic jobs," such as working at Mervyns for

8  three days.  She testified that she never worked anywhere other than Walmart for more than a

9  month. According to Plaintiff, she was unable to stay on the job due to panic attacks, her learning

10  disability and her "need to leave."  She had always had the same impairments but never knew that

11  Social Security was an alternative to her working.  When the ALJ questioned Plaintiff with her

12  earnings in prior years, Plaintiff was unable to explain how her condition had changed so that she

13  was now unable to work.  When the ALJ asked her about the two years in which she worked at a

14  casino, Plaintiff responded that she performed three different jobs while working there, switching

15  from one job to another because she was bored and had to deal with too many people, She

16  reported difficulty making correct change.

17    Plaintiff testified that she had been affected since childhood by a variety of personality and

18  anxiety disorders, including learning disabilities, attention deficit disorder, obsessive-compulsive

19  disorder and depression.  According to Plaintiff, her obsessive-compulsive disorder focused on

20  dirt and germs.  She repeatedly cleaned her house and repeatedly washed herself, without regard

21  to actual dirtiness.  Plaintiff had a history of alcohol abuse, which was in remission before she

22  applied for disability benefits.  As of December 2007, her medications included Celexa

23  (depression), Klonopin (anxiety), Topomax (obsessive-compulsive disorder and post traumatic

24  stress syndrome), and Melatonin (insomnia).

25    Plaintiff liked swimming "the most" and swam at the gym three or four times weekly. She

26  swam more frequently when she was unhappy. According to her disability report, she did not need

27  to be reminded to go places: "I take part in most activities."  Nor did she need anyone to

28  accompany her: "I can do most things on my own."

According to Plaintiff's father, who completed a third-party disability report in February 2006, Plaintiff spent her days doing household activities, swimming for exercise, and working part-time at Walmart.  She did cleaning, laundry and ironing, but not repairs or yard work, and performed all tasks at normal times and on as-needed basis.  She shopped as needed in a normal amount of time for her groceries and personal needs.  She visited with others, went to movies, and ate in restaurants.  She attended church.

**Plaintiff's psychiatrist.**  Psychiatrist Alan Peters, M.D., treated Plaintiff's depression and obsessive-compulsive disorder from December 6, 2004, to January 5, 2006, seeing her for twenty or thirty minutes about every few months.[2]  Peters monitored Plaintiff's medications, and referred her for one-to-one therapy.[3]  On December 6, 2004, Peters noted that Plaintiff was not adapting well to the disruption of her sleep cycle attendant with a casino job on the overnight shift.  Nonetheless he observed that, with recent changes in medication, Plaintiff felt better, her mood had stabilized, and her obsessive-compulsive thoughts were less intense.  She was more convivial and less morose.

By her followup appointment on January 20, 2005, however, Plaintiff had been briefly hospitalized after a disagreement with her aging father, quit her casino job, and precipitously married her boyfriend because it was "a good idea."[4]  By quitting her casino job, Plaintiff lost her medical insurance.  Peters noted that Plaintiff was not compliant with her medications.  Peters commented that Plaintiff, who had received Social Security disability payments until her earnings disqualified her, contemplated again seeking benefits.

In the interval before the next follow-up appointment on March 3, 2005, Plaintiff became pregnant, went off her medications, and miscarried.  Plaintiff told Peters that she wanted to wait a year before becoming pregnant again.  Her mental status was more positive: she was "not particularly depressed."

---

[2]  Plaintiff contended that Peters had treated her consistently since October 31, 2002.  The agency record only includes Peters' records for the indicated dates.

[3]  The record includes no evidence that Plaintiff ever received any psychological therapy.

[4]  The record does not include any records relating to the reported hospitalization.

Plaintiff did not see Peters again until an overdue follow-up on June 3, 2005. Peters noted that Plaintiff was "not really presenting with any kind of objective evidence to underscore her complaints of depression, nor anxiety." He wrote:

> She notes that she has not been doing well lately. She has become anxious, is depressed. Part of her agenda is to try and seek some disability, although in discussing it with her, I make clear that: 1) Social Security Disability, in particular, takes an extensive period of time to acquire, which she is aware of, as she has been on it in the past; 2) She may well be suffering an impairment but she does well when she is on appropriate medication, namely fluvoxamine 300 mg. at bedtime, which she has not been taking. Rather, she has been taking 200 mg. and then also her use of lorazepam 1 mg., which she should be taking one twice daily on a p.r.n. basis. She is only taking one and not even that often.
>
> Overall, her anxiety has to do with finances, as her husband is on disability. She is evasive with regards to her alcohol use, which has been problematic.

AR 179.

Although Plaintiff later attributed her noncompliance with medication to financial problems, Peters noted that Plaintiff had prescription coverage through CMSP and would receive coverage for her medications if Peters arranged prior authorization.

On September 21, 2005, Plaintiff reported experiencing anxiety and panic attacks in her new job at Walmart. Plaintiff feared that she might be bipolar. She wanted to move to Texas to live near her father. Peters noted, "[W]e discussed her ongoing dismay of her jobs and how she really wants little to do with the responsibility of working, or certainly of having expectations placed on her." AR 177.

 In November 2005, just prior to Plaintiff's applying for disability benefits, Peters noted that Plaintiff's recent marriage had become a source of stress because of her husband's alcohol and drug use, which the husband attributed to stress associated with Plaintiff's emotional and mental problems. Plaintiff's inclination was to leave and go live with her father in Texas. Of Plaintiff's job, Peters wrote:

> The patient continues to work at Walmart, which she finds dismal. She continues working in the men's department, having to lift heavy things, and is alone. She is not able to multitask and feeling overwhelmed [*sic*] much of the time. She asks for a note wherein she might be able to get a transfer into something like cashiering, which she has been told will be done but she has perceived it as foot dragging.

AR 175.

Describing Plaintiff as "forlorn," Peters diagnosed her problem as marital problems superimposed on her obsessive compulsive disorder.  Despite Plaintiff's claim of being clean and sober, Peters directed her to resume treatment with Doris Jensen.[5]

On January 5, 2006, Peters documented Plaintiff's problems with lithium, which made her vomit, and stomach problems that the hospital emergency room attributed to stress.  Plaintiff's marital problems continued.  Despite the reported digestive problems, Plaintiff was eating excessively and had gained weight.  Peters referred Plaintiff for one-on-one therapy at the women's center.[6]

**Psychological consultant.**  Psychologist Joe M. Azevedo, Ph.D., evaluated Plaintiff for the agency on June 24, 2006.  Plaintiff told Acevedo that she was working 32 hours per week at Walmart.  He opined:

> The patient has the general cognitive abilities to understand, remember, and carry out one- and two-step instructions of mild to moderate levels of complexity.  Her abilities in maintaining concentration, persistence, and pace seem to be variably impaired, increasingly so during times of increased anxiety.  She maintains the ability to make judgments on simple work-related decisions.  Her anxiety is likely to result in periodic disruptions in her attempts to manage work pressures and respond to changes in a typical work environment.  There also appear to be at least mild limitations in her ability to interact appropriately with supervisors, co-workers, and the general public on a consistent basis.
>
> She appears to have only mild psychological restrictions in managing activities of daily living, associated with her obsessive-compulsive behaviors and the associated time-consuming elements.

AR 190.

In a psychiatric review technique performed August 21, 2006, agency psychiatrist Archimedes Garcia identified that Plaintiff had affective and personality disorders that resulted in mild functional limitations, but had no restriction of activities of daily living, difficulties in maintaining social functioning, or difficulties in maintaining concentration, persistence and pace.

///

---

[5] The record does not identify Doris Jensen or the type of treatment she provided.  No records of any treatment Plaintiff may have received from Doris Jensen are included in the record.

[6] No reports of any treatment Plaintiff may have received from the Women's Center are included in the record.

In September 2006, two weeks after a change in her medications, Plaintiff felt "weird" and was treated in the emergency room of Tuolomne General Hospital.  The hospital found nothing wrong.

On February 15, 2007, Peters completed an assessment of Plaintiff's ability to do work-related activities.  He opined that Plaintiff had fair ability to follow work rules, relate to co-workers, deal with the public, use judgment, and understand, remember and carry out job instructions.  She had poor or no ability to interact with supervisors; deal with work stress; function independently; maintain attention or concentration; understand, remember and carry out complex job instructions; or understand, remember, and carry out detailed, but not complex, job instructions.   Peters explained that the intrusive nature of Plaintiff's obsessive-compulsive thoughts interfered with her ability to pay attention and to process instructions.  Peters also completed a psychiatric review technique, concluding that Plaintiff had marked limitations in activities of daily living and maintaining social functioning, and frequent deficiencies of concentration, persistence or pace.  Peters reported that Plaintiff had three or more instances of deterioration or decompensation, but did not explain what those instances were.

On October 9, 2007, Lorrin M. Koran, M.D., evaluated Plaintiff on Peters' referral.  Koran opined that, in addition to her other impairments, Plaintiff displayed symptoms supporting a diagnosis of Tourette disorder.  Koran described Plaintiff's obsessive-compulsive disorder as severe and treatment-resistant.  Plaintiff's obsessive-compulsive disorder and anxiety had the capacity to inappropriately influence her judgment.

Koran suggested that Plaintiff would benefit from a complex regimen of medications as well as cognitive behavioral therapy focused on her obsessive-compulsive disorder and skin-picking.[7]  Plaintiff should be evaluated to identify the most beneficial medications for her impairments.  Koran offered no opinion on Plaintiff's ability to work.

George Meyers, a vocational expert, testified that Plaintiff could perform several of her prior jobs, including cafeteria attendant, retail sales clerk, and deli clerk.

---

[7] Nothing in the record indicates that Plaintiff began a more complex regimen of medications or received cognitive behavioral therapy following Koran's recommendations.

## II.   Discussion

### A.   Scope of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper legal standards, and if the ALJ's findings are supported by substantial evidence. *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).

### B.   Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c (a)(3)(A).  A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability.  20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f).  The process requires consideration of the following questions:

| Step one: | Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two. |
|---|---|
| Step two: | Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate. |
| Step three: | Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four. |
| Step four: | Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five. |
| Step five: | Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled. |

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

ALJ Havens found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of December 29, 2005.  Her severe impairments included depression, anxiety, obsessive-compulsive disorder, and attention deficit disorder.   The ALJ concluded, however, that none of Plaintiff's impairments met or equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Plaintiff remained capable of performing her past work as a retail sales clerk, cafeteria attendant, and delicatessen clerk.  Accordingly, the ALJ concluded that Plaintiff was not disabled.

**C.   Step One:** **Is the Claimant Engaging in Substantial Gainful Activity?**

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of December 29, 2005.  In making this determination, the ALJ erred since Plaintiff clearly engaged in substantial gainful activity after the December 29, 2005 onset date.

**Substantial gainful activity.**  The hearing decision stated, "In order to reach a conclusion as to whether the claimant engaged in substantial gainful activity at any time after the alleged onset date, further evidence must be obtained and additional evaluation must be made." AR 10. The ALJ skipped step one, reasoning that, since Plaintiff's claim could be denied at step four, she need not determine whether Plaintiff engaged in substantial gainful activity.  Substantial evidence

///

supported a conclusion that Plaintiff engaged in substantial gainful activity after the alleged onset
date of her disability.

An individual engaged in substantial gainful activity may not receive disability benefits
regardless of his or her medical condition, age, education, and work experience.  20 C.F.R. §
416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  Substantial gainful activity is work that is
both substantial and gainful.  20 C.F.R. § 416.972.  Substantial work, which includes part-time
work, involves significant mental or physical activities.  20 C.F.R. § 416.972 (a).  No person who
is capable of performing substantial gainful employment is entitled to disability benefits, even if
he or she has a mental or physical disability.  42 U.S.C § 1382c (a)(3)(A) and (B); *Corrao v.
Shalala*, 20 F.3d 943, 947 (9th Cir. 1994).  Substantial gainful activity bars a finding of disability.
*Clauson v. Astrue*, 231 Fed.Appx. 660, 662 (9th Cir. 2007).

At step one, the applicant bears the burden of proving that he or she is not working.  20
C.F.R. § 416.912; *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987).  Although the ALJ has the
duty to develop an adequate record from which a reasonable conclusion can be drawn, he or she
need not further develop a record from which a reasoned evaluation may be drawn.  *Ribeiero v.
Barnhart*, 149 Fed.Appx. 7, 8 (1st Cir. 2005)(*internal quotations and citations omitted*).

**The earnings presumption.**  Disability benefits are intended to ensure that disabled
persons have sufficient income to maintain a minimum standard of living.  20 C.F.R. § 416.110.
The agency's principal way to evaluate work activity is to apply the earnings guidelines.  20
C.F.R. § 416.974 (b)(2).  If an applicant's monthly earnings for the year in question average more
than the amount for the previous year, or if the applicant's earnings exceed the guideline amount,
the applicant is presumed to have engaged in substantial gainful activity.  *Id.*  Plaintiff's 2006
earnings (the last year for which income information is included in the agency record) create a
presumption of substantial gainful activity using either measure.  Plaintiff's 2006 earnings
($10,366.45) exceed those of 2005 ($9124.14).  For 2006, the monthly guideline amount was
$860.00.  Plaintiff's average monthly earnings ($10,366.45/12) in 2006 were approximately $864.
Accordingly, Plaintiff is presumed to have engaged in substantial gainful activity in 2006.
///

1   Although an applicant's income creates a presumption of substantial gainful activity, the

2   guidelines are only a presumption and do not relieve the ALJ from fully and fairly developing the

3   record. *Corrao*, 20 F.3d at 948.   For an activity to constitute substantial gainful activity, it must

4   involve "significant physical or mental activities" and must be the type of work usually performed

5   for pay or profit. *Id.*  Plaintiff's work as a retail salesperson meets this requirement.

6   A claimant may rebut the presumption by establishing an inability to perform the job well,

7   without special assistance, or only for brief periods of time. *Keyes v. Sullivan*, 894 F.2d 1053,

8   1056 (9th Cir. 1990).  Other relevant factors are the amount of time spent working, the quality of

9   the person's performance, special working conditions, and the possibility of self-employment.

10  *Katz v. Secretary of Health & Human Services*, 972 F.2d 290, 293 (9th Cir. 1992).

11  Plaintiff testified that she was able to hold jobs for less than two months at a time.

12  Although slight work performed for minimal amounts of time is not substantial, part-time work

13  may constitute substantial gainful activity.  20 C.F.R. § 416.972(a); *Corrao*, 20 F.3d at 948.  Until

14  she left Walmart in August 2006, Plaintiff worked nearly full time, 35 to 40 hours per week, an

15  amount certainly within the boundaries of substantial work. *See Keyes*, 894 F.2d at 1056

16  (approximately twenty-five hours of work per week is substantial gainful activity). *See also*

17  *Burkhalter v. Schweiker*, 711 F.2d 841, 843 (8th Cir. 1983) (a claimant who was able to work

18  competently as a house cleaner on a regular basis without special help was engaged in substantial

19  gainful activity even though she only worked five hours daily).  Plaintiff's claim is not credible.

20  The assertion that Plaintiff was unable to hold a job more than a month or two did not

21  emerge until a disability report filed September 19, 2006, in which Plaintiff claimed that she was

22  unable to hold a job for more than two months at a time since filing for disability.  Plaintiff's

23  attorney again raised the issue on her behalf in a transmittal letter to the ALJ, commenting that

24  under SSR 96-8p, Plaintiff's sporadic job history demonstrated that Plaintiff was not able to work

25  on a regular and consistent basis.  Curiously, Plaintiff continued to work at Walmart for well over

26  two months after applying for disability benefits.  She then moved to Utah where she again

27  worked full- or nearly full-time in a retail sales job.  Shortly after returning to California from

28  ///

11

Utah and her resumption of her job at Walmart, Plaintiff reported to the agency that her departure from these two jobs was unrelated to her physical impairments.

Social Security Ruling 96-8p, which addresses the determination of residual functional capacity when an individual is not engaging in substantial gainful activity, does not support Plaintiff's contentions.  Nor does Plaintiff convincingly tie her impairments to her multiple jobs in rapid succession after leaving Walmart in August 2006.  Until that point, nothing in the record suggests that Plaintiff's job behavior differed significantly from the large number of young (and some not-so-young) people, who periodically swap one low-paid service sector position for another, whether motivated by boredom, convenience, or the promise of a small increment in hourly wages.  Plaintiff herself testified that she had her psychological condition her entire life and it had not suddenly worsened.

Unfortunately, neither the ALJ nor Plaintiff's attorney asked Plaintiff why she began quickly changing jobs in August 2006 or why she completely stopped working in November 2006. The ALJ sidestepped the matter by skipping step one. Nonetheless, substantial evidence in the record as a whole established that Plaintiff engaged in substantial gainful activity and was not disabled.

### D.   Did the ALJ improperly evaluate the physicians' opinions?

Plaintiff first contends that the ALJ improperly rejected the opinions offered by her treating physician, Peters, and her examining physician, Koran, while giving undue weight to the opinion of examining physician Acevedo, who provided a consulting opinion on behalf of the agency.  The ALJ explained the weight given to the medical opinions:

> As for opinion evidence, the undersigned gives substantial weight to the assessments of the State Agency medical consultant [Acevedo] to the effect that the claimant [could] understand, remember and carry out complex instructions, make judgments on simple, work-related matters and interact appropriately with supervisors, co-workers and the public with only mild limitation.  This assessment is wholly consistent with the weight of the evidence of record and rendered by a physician who is expert in the evaluation of the medical issues in disability claims under the Social Security Act.  Little weight is given to the assessment of the State Agency medical consultant to the effect that the claimant has a less than severe impairment as this is not consistent with the weight of the evidence of record.
>
> The undersigned gives little weight to the assessment of the claimant's treating physician Allan Peters, M.D., because it is not well-supported by his treatment

records showing the claimant maintaining well when she is compliant with medications.  Likewise, the claimant [*sic*] gives little weight to the assessment of Lorrin Koran, M.D., to the effect that the claimant is disabled.  This non-examining doctor's opinion is without substantial support from the other evidence of record, which obviously renders it less persuasive.  Further, the doctor apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported.  Yet, as explained elsewhere in this decision, there exist good reasons for questioning the reliability of the claimant's subjective complaints.

AR 14-15 (*citations to exhibits omitted*).

## 1.      **Evaluation of Doctor's Opinions**

Physicians render two types of opinions in disability cases: (1) medical, clinical opinions regarding the nature of the claimant's impairments and (2) opinions on the claimant's ability to perform work.  *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  An ALJ is "not bound by an expert medical opinion on the ultimate question of disability." *Tomasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008); Social Security Ruling 96-5p.  The regulations provide that medical opinions be evaluated by considering (1) the examining relationship; (2) the treatment relationship, including (a) the length of the treatment relationship or frequency of examination, and the (b) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors that support or contradict a medical opinion.  28 C.F.R. § 404.1527(d).

Three types of physicians may offer opinions in social security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant (nonexamining physicians)." *Lester*, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight than the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a non-examining physician.  *Id.*  The Social Security Administration favors the opinion of a treating physician over that of nontreating physicians.  20 C.F.R. § 404.1527; *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007).  A treating physician is employed to cure and has a greater opportunity to know and observe the patient.  *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987).

1  Nonetheless, a treating physician's opinion is not conclusive as to either a physical condition or
2  the ultimate issue of disability.  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

3  Once a court has considered the source of a medical opinion, it considers whether the
4  Commissioner properly rejected a medical opinion by assessing whether (1) contradictory
5  opinions are in the record; and (2) clinical findings support the opinions.  The ALJ may reject the
6  uncontradicted opinion of a treating or examining medical physician only for clear and convincing
7  reasons supported by substantial evidence in the record.  *Lester*, 81 F.3d at 831.  Even though the
8  treating physician's opinion is generally given greater weight, when it is contradicted by an
9  examining physician's opinion that is supported by different clinical findings the ALJ may resolve
10 the conflict.  *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).  The ALJ must set forth a
11 detailed and thorough factual summary, address conflicting clinical evidence, interpret the
12 evidence and make a finding.  *Magallanes*, 881 F.2d at 751-55.  Without specific and legitimate
13 reasons to reject the opinion, the ALJ must defer to the treating or examining professional.
14 *Lester*, 81 F.3d at 830-31.  The ALJ need not give weight to a conclusory opinion supported by
15 minimal clinical findings.  *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999); *Magallanes*, 881
16 F.2d at 751.

17 Although an ALJ is not bound by opinions rendered by a plaintiff's physicians regarding
18 the ultimate issue of disability, he or she cannot reject them out of hand, but must set forth clear
19 and convincing reasons for rejecting them.  *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993).
20 A general statement that objective factors or the record as a whole are insufficient: the ALJ must
21 tie the objective factors or the record as a whole to the opinions and findings that he or she rejects.
22 *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).

23 **2.   Dr. Peters**

24 The ALJ gave little weight to treating physician Peters' opinion, finding it inconsistent
25 with the statement in his treatment records that Plaintiff did well when she was compliant with her
26 medications. In evaluating Peters' opinion, relevant factors include the nature and extent of the
27 treatment relationship, supportability and consistency.
28 ///

Peters' status as the sole treating physician to provide an opinion in Plaintiff's disability application is not disputed.  Plaintiff contends that Peters treated her for many years yet provided treatment notes only for the limited period of December 6, 2004, to January 5, 2006, during which Plaintiff saw Peters seven times.  The brief and infrequent appointments apparently existed primarily to permit Peters to supervise Plaintiff's continuing prescription medications.  Although the record includes no evidence that Plaintiff ever received any psychological therapy, Peters repeatedly referred Plaintiff to others for that treatment.  The treatment notes assess Plaintiff's mood and thought processes, as well as current stressors then affecting Plaintiff.  Peters monitored the effects of Plaintiff's medications, addressed side effects, and adjusted dosages.  During the period covered in the treatment notes, Plaintiff confronted a variety of stressors including a third-shift job, an impulsive wedding followed by a difficult marriage, a pregnancy during which she discontinued her medications, sharing a home with her new mother-in-law, a miscarriage, a move to another state, and an emergency return to California.  Nonetheless, her appointments with Peters were short and infrequent, and her illness was conservatively managed solely through medication.  Throughout this period, Plaintiff reportedly did well when she complied with the prescribed timing and dosage of her medications and did poorly when she was noncompliant.

Peters' February 15, 2007 assessment was not consistent with the treatment notes.  His opinion of marked limitations in daily living activities and maintenance of social function as well as frequent deficiencies of concentration, persistence, and pace contrasted sharply with the level and intensity of treatment provided, that is to say, medication and infrequent monitoring through short appointments.  Nor is the opinion consistent with treatment notes indicating that medication improved Plaintiff's general well being and stabilized her mood while diminishing the intensity of her obsessive-compulsive thoughts.  When compliant with her medications, Peters wrote that Plaintiff was more convivial, less morose, had more positive mental status, was not particularly depressed.  Most telling was Peters' observation that Plaintiff did not like to work and did not want the responsibility of working or other expectations.  When Plaintiff indicated her intent to seek disability, Peters observed that Plaintiff's abilities were not impaired when she was compliant with her medications.

Similarly, Peters' treatment notes do not support his opinion. Most obviously, the notes include no evidence of three or more instances of deterioration or decompensation. Other than recording Plaintiff's dislike of her jobs and of work in general, the notes include no information supporting Peters' opinion that Plaintiff had fair ability to follow work rules, relate to co-workers, deal with the public, use judgment, and understand, remember and carry out job instructions, but had poor or no ability to interact with supervisors; deal with work stress; function independently; maintain attention or concentration; understand, remember and carry out complex job instructions; or understand, remember, and carry out detailed, but not complex, job instructions.

Plaintiff counters by pointing out those portions of the treatment notes that support her disability claims. That portions of the notes support an opinion contrary to the hearing decision is immaterial. The standard of this Court's review is whether substantial evidence supports the Commissioner's decision, not whether substantial evidence could have supported an alternative conclusion. 42 U.S.C. § 405(g).

Plaintiff also objects to the ALJ's addressing her noncompliance with medication since, as Peters recognized, Plaintiff sometimes failed to take medications, claiming she could not afford them. That Plaintiff was sometimes noncompliant with her medications was not the point of the ALJ's finding. Instead the ALJ sought to emphasize that Plaintiff was not severely functionally impaired when she took her medications. In any event, the treatment records noted that Plaintiff's claim that finances dictated her noncompliance was baseless in light of coverage available from CMSP and Peters' willingness to expedite prior approval requests for her medications.

The ALJ did not err in assigning Peters' opinion little weight.

### 3. **Dr. Koran**

The ALJ gave little weight to Koran's report, which she found unpersuasive for its lack of support from other evidence in the record and reliance on Plaintiff's subjective reports of her symptoms and limitations.

According to Koran, Peters referred Plaintiff to Koran "for consultation regarding management of her multiple mental health disorder." AR 262. Koran's report set forth his opinion of her proper diagnoses and suggested pharmacological and therapeutic measures that might

16

effectively treat her symptoms.  The Court was unable to identify any opinion that Koran

considered Plaintiff disabled.  To the contrary, Koran expressed optimism that a series of trials of

various medications and combinations of medications could address Plaintiff's multiple symptoms,

particularly if combined with cognitive behavior therapy.  (There is no evidence that Plaintiff

followed through with Koran's recommendations for medication and therapy.)

Plaintiff adds that the ALJ erred in evaluating Koran as a nonexamining physician.  Since

the ALJ's opinion recognizes that Koran examined Plaintiff, the Court agrees with the

Commissioner that this misdesignation is no more than a typographical or transcription error.

Substantial evidence supported the ALJ's assessment of Koran's opinion.

### 4.    Dr. Acevedo

Although the ALJ disagreed with Acevedo's determination that Plaintiff did not have a

severe impairment, she gave substantial weight to the psychologist's assessment that Plaintiff

could understand, remember, and carry out complex instructions; make judgments on simple work-

related matters, and interact appropriately with supervisors, co-workers, and the general public.

Noting Acevedo's specialization in the medical issues of disability claims, the ALJ found

Acevedo's opinions consistent with the record as a whole.

The Court agrees with the ALJ.  Acevedo's report was extensive and complete.  His

objective of evaluating Plaintiff's current levels of cognitive, emotional, perceptual, and motor

functioning was clearly stated.  He considered Plaintiff's reported mental health history and her

application for disability benefits.  Acevedo administered various tests of verbal and perceptual

intelligence, on which she generally scored in the low normal range.  Plaintiff related competency

in activities of daily living: supporting herself with her Walmart earnings, maintaining personal

grooming and hygiene, socializing with friends, enjoying swimming and television.  That Plaintiff

also told Acevedo that she was working at Walmart at the time Acevedo examined her was

powerful proof Acevedo's findings that she was able to work in a substantially gainful activity.

### 5.    Summary

The ALJ properly evaluated the opinions of the various physicians.

///

1    **E.    Step Three: Did Plaintiff Meet Listing 12.04 or 12.06?**

2         The ALJ found that Plaintiff's severe impairments included depression, anxiety, obsessive-

3    compulsive disorder, and attention deficit disorder.  Focusing on her meeting the requirements of

4    Subsection A of each listing, Plaintiff contends that the ALJ erred in failing to find that she

5    satisfied the requirements of 20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.04 (affective disorders) or §

6    12.06 (anxiety related disorders).  The Court need not address whether Plaintiff satisfied the

7    requirements of Subsection A of each list since Plaintiff fails to satisfy the remaining requirements

8    of the listing.

9         **1.    Subsections A and B**

10        For step three of the analysis, the ALJ evaluated Plaintiff using 20 C.F.R., Pt. 404, Subpt.

11   P, App. 1, §§ 12.04 and 12.06,  which considered affective disorders and anxiety related disorders.

12   Both listings are similarly structured, first providing an introductory statement characterizing the

13   nature of the impairment.  Subsection A of each of listings is tailored to set forth the criteria

14   supporting the specific medical diagnosis.  20 C.F.R., Pt. 404, Subpt. P, App. 1, §12.00A.  With

15   regard to affective disorders, such as depression or bipolar disorder, Section 12.04 provides:

16        12.04 *Affective Disorders:*   Characterized by a disturbance of mood,
          accompanied by full or partial manic or depressive syndrome.  Mood refers to
17        prolonged emotion that colors the whole psychic life; it generally involves either
          elation or depression.
18        The required level of severity for these disorders in met when the
          requirements in both A and B are satisfied, or when the requirements in C are
19        satisfied.

20        A. Medically documented persistence, either continuous or intermittent, of
          one of the following:

21
          1. Depressive syndrome characterized by at least four of the following:
22
          a. Anhedonia or pervasive loss of interest in almost all activities; or
23        b. Appetite disturbance with change in weight; or
          c. Sleep disturbance; or
24        d. Psychomotor agitation or retardation; or
          e. Decreased energy; or
25        f. Feelings of guilt or worthlessness; or
          g. Difficulty concentrating or thinking; or
26        h. Thoughts of suicide; or
          i. Hallucinations, delusions, or paranoid thinking . . . . .

27   *///*

28

With regard to anxiety-related disorders, Section 12.06 provides:

12.06. *Anxiety Related Disorders:* In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.
The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.

A.  Medically documented findings of at least one of the following:

1.  Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:
a.  Motor tension; or
b.  Autonomic hyperactivity; or
c.  Apprehensive expectation; or
d.  Vigilance and scanning;

or

2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

3.  Recurrent severe panic attacks manifested by a sudden unpredictable onset of instant apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4.  Recurrent obsessions or compulsions which are a source of marked distress; or

5.  Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress.

A claimant must satisfy the requirements of both subsections A and B, or of Subpart C, to

qualify for either listing. As Plaintiff contends in this appeal, sufficient evidence in the record

could be mustered to satisfy the requirements of subsection A for either listing.  Nonetheless, the

ALJ did not analyze whether Plaintiff satisfied the requirements of subsection A because he found

that Plaintiff could not satisfy the requirements of subsection B or C.  He did not err in failing to

provide a written analysis of subsection A.

To satisfy subpart B of either listing, the symptoms found in subpart A of that listing must

result in at least two of the following:

1.  Marked restriction of activities of daily living; or

2.  Marked difficulties in maintaining social functioning; or

19

3.  Marked difficulties in maintaining concentration, persistence, or pace; or

4.  Repeated episodes of decompensation, each of extended duration.

**Daily Living.**  Without great detail, the ALJ concluded that Plaintiff had a mild restriction of the activities of daily living.  The regulation provides:

> *Activities of daily living* include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office.  In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability.  We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction.

> We do not define "marked" by a specific number of activities of daily living in which functioning is impaired, but by the nature and overall degree of interference with function.  For example, if you do a wide range of activities of daily living, we may still find that you have a marked limitation in your activities if you have serious difficulty performing them without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions.

> 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00 C.1.

Plaintiff contends that her deteriorating mental health and excessive fear and worry supported a finding of marked restrictions of daily living.  As set forth in the agency record summary above, Plaintiff functioned well on a day-to-day basis, caring for her home and husband, shopping, holding a job, and attending church among other things.  She was able to care for herself and demonstrated good personal hygiene.  She was capable of relocating to another state, finding work, and then returning to California to respond to a family emergency.  In her disability report, Plaintiff herself reported that she was generally able to take care of herself.  Substantial evidence supported the ALJ's finding that Plaintiff's impairments caused only mild restriction of her activities of daily living.

**Social Functioning.**  The regulatory definition states:

> *Social functioning* refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals.  Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers.  You may have demonstrated impaired social functioning by, for example, a history of altercations, evictions, firings, ***fear of strangers, avoidance of interpersonal relationships, or social isolation***.  You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities.  We also need to consider cooperative behaviors, consideration for others, awareness of others' feelings, and

social maturity.  Social functioning in work situations may involve interaction with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers.

We do not define "marked" by a specific number of different behaviors in which social functioning is impaired, but by the nature and overall degree of interference with function.  For example, if you are highly antagonistic, uncooperative, or hostile but are tolerated by local shopkeepers, we may nevertheless find that you have a marked limitation in social functioning because that behavior is not acceptable in other social contexts.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00 C.2 (*emphasis added*).

Plaintiff contends that her testimony supported a finding of restrictions of social function. As detailed in the agency record summary above, Plaintiff socialized with friends, remarried, ate in restaurants and attended church, among other social activities.  Substantial evidence in the record as a whole supports the ALJ's determination.

**Concentration, Persistence, and Pace.**  The ALJ concluded that Plaintiff had moderate difficulties with concentration, persistence, or pace.  The corresponding regulatory provision provides:

*Concentration, persistence, or pace* refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings.  Limitations in concentration, persistence or pace are best observed in work settings, but also may be reflected by limitations in other settings.  In addition, major limitations in this area can often be assessed through clinical examination or psychological testing.  Wherever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence.

On mental status examinations, concentration is assessed by tasks such as having you subtract serial sevens or serial threes from 100.  In psychological tests of intelligence or memory, concentration is assessed through tasks requiring short-term memory or through tasks that must be completed within established time limits.

In work evaluations, concentration, persistence, or pace is assessed by testing your ability to sustain work using appropriate production standards, in either real or simulated work tasks (e.g., filing index cards, locating phone numbers, or disassembling and reassembling objects).  Strengths and weaknesses in areas of concentration and attention can be discussed in terms of your ability to work at a consistent pace for acceptable periods of time and until a task is completed, and your ability to repeat sequences of action to achieve a goal or an objective.

We must exercise great care in reaching conclusions about your ability or inability to complete tasks under the stresses of employment during a normal workday or work week based on a time-limited mental status examination or psychological testing by a clinician, or based on your ability to complete tasks in other settings that are less demanding, highly structured, or more supportive.  We must assess your ability to complete tasks by evaluating all the evidence, with an emphasis on

how independently, appropriately, and effectively you are able to complete tasks on a sustained basis.

We do not define "marked" by a specific number of tasks that you are unable to complete, but by the nature and overall degree of interference with function.  You may be able to sustain attention and persist at simple tasks but may still have difficulty with complicated tasks.  Deficiencies that are apparent only in performing complex procedures or tasks would not satisfy the intent of this paragraph B criterion.  However, if you can complete many simple tasks, we may nevertheless find that you have marked limitation in concentration, persistence, or pace if you cannot complete these tasks without extra supervision or assistance, or in accordance with quality and accuracy standards, or at a consistent pace without an unreasonable number and length of rest periods, or without undue interruptions or distractions.

Although the hearing decision recognized that Plaintiff had moderate difficulties in concentration, persistence, or pace, the record does not support the a contention in Plaintiff's memorandum of law that she is unable to function independently outside of her home.  To the contrary, the record as a whole included substantial evidence that, despite some restriction in this regard, Plaintiff functioned well outside her home and was both capable of holding a job and actually did hold a job.

**Decompensation episodes.**  The regulation provides:

*Episodes of decompensation* are exacerbations or temporary increases in symptoms or signs accompanied by loss of adaptive functioning, as manifested by difficulties in performing activities in daily living, maintaining social relationships, or maintaining concentration, persistence or pace.  Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or combination of the two).  Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directed household); or other relevant information in the record about the existence, severity, and duration of the episode.

The term *repeated episodes of decompensation, each of extended duration* in these listings means three episodes within one year, or an average of once every 4 months, each lasting for at least 2 weeks.  *If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence.*

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00 C.4 (*emphasis added*).

The ALJ found no evidence of episodes of decompensation.  Plaintiff does not challenge her conclusion.

**Summary.** Because substantial evidence did not establish that Plaintiff satisfied two provisions in subsection B, she did not satisfy the listing criteria of meeting the requirements of both subsections A and B.

### 2.   Subsection C

For Listing 12.06, subsection C requires that the claimant's disorder result in a "complete inability to function outside the area of ones home." The agency record provides substantial evidence of Plaintiff's ability to satisfactorily function outside her home.

For listing 12.04, subsection C provides:

Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such arrangement.

Nothing in the record supports a finding that Plaintiff met any of the listing 12.04 subsection C requirements. Substantial evidence supported the ALJ's determination that Plaintiff did not meet the listing requirements of 12.04 or 12.06.

### F.   Plaintiff's Credibility

Plaintiff contends that the ALJ erred in finding that (1) her medical treatment did not reach the levels to be expected for a totally disabled individual; (2) Plaintiff's treatment was routine and conservative, and her medications ameliorated her symptoms if she was compliant with the prescribed doses and timing; (3) Plaintiff had a history of alcohol abuse and was not candid with her psychiatrist regarding the status of her remission; (4) despite claiming that she had suffered with obsessive compulsive disorder since birth Plaintiff had completed college course the extreme nature of the symptoms to which Plaintiff testified was implausible in light of the evidence in the

///

record; and (4) Plaintiff claimed not to be aware of disability benefits and continued working after applying for social security.  Plaintiff contends that the ALJ erred.

An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional requirement.  *Orn*, 495 F.3d at 635, *quoting Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).  But if he or she decides to reject a claimant's pain testimony after a medical impairment has been established, the ALJ must make specific findings assessing the credibility of the claimant's subjective complaints.  *Ceguerra v. Secretary of Health and Human Services*, 933 F.2d 735, 738 (9th Cir. 1991). "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints."  *Lester*, 81 F.3d at 834, *quoting Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988).  He or she must set forth specific reasons for rejecting the claim, explaining why the testimony is unpersuasive.  *Orn*, 495 F.3d at 635.  *See also Robbins v. Social Security Administration*, 466 F.3d 880, 885 (9th Cir. 2006).  The credibility findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."  *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

When weighing a claimant's credibility, the ALJ may consider the claimant's reputation for truthfulness, inconsistencies in claimant's testimony or between her testimony and conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties about the nature, severity and effect of claimant's claimed symptoms.  *Light v. Social Security Administration*, 119 F.3d 789, 792 (9th Cir. 1997).  The ALJ may consider "(1) ordinary techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities."  *Tommasetti*, 533 F.3d at 1039 (9th Cir. 2008), *quoting Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996).  If the ALJ's finding is supported by substantial evidence, the Court may not second-guess his or her decision.  *Thomas*, 278 F.3d at 959.

///

24

The Ninth Circuit has summarized the applicable standard:

[T]o discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide "'specific cogent reasons for the disbelief.'" *Morgan*, 169 F.3d [595,] 599 [9th Cir. 1999] (quoting *Lester*, 81 F.3d at 834).  The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." *Id.* Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing." *Id.*  Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony . . . An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules.  *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, . . . and are to be relied upon as precedent in adjudicating cases."); *see Daniels v. Apfel*, 154 F.3d 1129, 1131 (10th Cir. 1998) (concluding the ALJ's decision at step three of the disability determination was contrary to agency rulings and therefore warranted remand).  Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment."  *Fair*, 885 F.2d at 603; *see also Thomas*, 278 F.3d at 958-59.

*Orn*, 495 F.3d at 635.

Here, the ALJ thoughtfully explained his reasons for discounting Plaintiff's credibility in great detail, emphasizing the inconsistencies in Plaintiff's testimony and her ability to continue working well beyond the alleged disability date.  His determination was supported by substantial evidence.  Having reviewed the record as a whole, the Court agrees with the ALJ's assessment of Plaintiff's lack of credibility.

Once again, Plaintiff is confused about the scope of this Court's review of the Commissioner's decisions.  Even if the record includes evidence supporting the interpretation that Plaintiff favors, the applicable measure is whether the ALJ's determination was supported by substantial evidence.  The treatment notes in the agency record, including Plaintiff's own report of December 6, 2007, fully support the ALJ's determination in that Plaintiff's impairments were addressed pharmacologically with period follow-up appointments to permit Plaintiff's psychiatrist to monitor her condition.  Interestingly, Plaintiff submitted only a limited number of Dr. Peters' treatment notes and no documentation at all of Dr. Gleason's treatment.

Despite Plaintiff's protest of her difficulties in college and at work, Plaintiff was able to attend college and to work.  The Court is not impressed by Plaintiff's offer to amend her alleged

1    disability date after the agency discovered that she applied for benefits but continued to work after

2    the alleged disability date.  Indeed, the Court finds Plaintiff to lack credibility specifically because

3    of her attempts to manipulate the system so that she could continue to work and earn until she

4    could support herself with taxpayer assistance.  Plaintiff's testimony that, because she was

5    unfamiliar with Social Security, she had no idea that she should not have continued to work after

6    her alleged disability date is especially incredible in light of her telling Peters that she had

7    previously received disability assistance, had lost it when she earned too much money, but wanted

8    to regain disability benefits.  Elsewhere, noting Plaintiff's ongoing dismay with her jobs, Peters

9    commented that Plaintiff "really wants little to do with the responsibility of working."  AR 177.

10       The contradictions between Plaintiff's testimony and behavior, and the other evidence is

11   apparent in a number of areas.  For example, Plaintiff claimed to be unable to make change, yet

12   repeatedly worked in cashier positions.  She claimed to have panic attacks if too many people were

13   around, yet she sought to have her Walmart supervisors transfer her from the men's department to

14   the cash registers because she was alone in the men's department.  Plaintiff claimed that she was

15   repeatedly discharged from jobs for learning disabilities, but her employment history showed that

16   she was able to hold jobs for several years at a time.  Plaintiff herself reported that she left various

17   jobs for reasons unrelated to her impairments.

18       The ALJ's assessment of Plaintiff's credibility was supported by substantial evidence.

19       **G.    Plaintiff's Father's Statement**

20       Plaintiff contends that the ALJ erred in failing to assign weight to the third-party disability

21   report of Plaintiff's father, Robert Lowry.  In the course of assessing Plaintiff's limitations, the ALJ

22   acknowledged various details Lowry's report in a full paragraph.

23       "Lay testimony as to a claimant's *symptoms* is competent evidence which the Secretary

24   must take into account, unless he ultimately determines to disregard such testimony, in which case

25   'he must give reasons that are germane to each witness.'"  *Nguyen v. Chater*, 100 F.3d 1462, 1467

26   (9th Cir. 1996), *quoting Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993).  Friends and family

27   members who are in a position to observe the claimant's symptoms and daily activities are

28   competent to testify about their observations of the claimant's condition.  *Dodrill*, 12 F.3d at 918-

19.  An ALJ's disregard of the testimony of friends and family members violates the regulations, which provide for consideration of the observations of non-medical sources regarding the effects of the claimant's impairments on his ability to work.  *Id., citing* 20 C.F.R. § 404.1513(e)(2).[8]  *See also Sprague*, 812 F.2d at 1232.  When a claimant alleges symptoms that are not supported by medical evidence in the record, the agency directs the adjudicator to obtain information about those symptoms from third parties likely to have such knowledge.  SSR 88-13.  The ALJ must give "full consideration" to such testimony.  Id.

Plaintiff's claim that the ALJ failed to assign weight to her father's report is baffling.  The ALJ fully considered the report in the course of the hearing opinion.  Nothing more was required.

### H.    Vocational Expert Testimony

Citing *Robbins*, 466 F.3rd at 883, for the proposition that an ALJ must consider all relevant evidence in determining a claimant's residual functional capacity, Plaintiff contends that the ALJ erred in failing to pose hypothetical questions including all of Plaintiff's limitations.  Taken in context, the language on which Plaintiff relies relates to an ALJ's determination of a claimant's credibility.  Later in the *Robbins* opinion, addressing Robbins' contention that the ALJ failed to include some of his functional limitations, the court opined, "[T] ALJ must only include those limitations supported by substantial evidence."  *Id.* at 886.  Because the *Robbins* court concluded that the ALJ erred in disregarding the testimony of Robbins and his father, the ALJ in *Robbins* erred by not including evidence derived from that testimony in its hypothetical questions.  *Id.*

This case is distinguishable in that the ALJ here did not wrongly exclude any of the evidence that Plaintiff would have had her include.  The hypothetical questions in this case satisfied the *Robbins* standard since they include all limitations supported by substantial evidence.

### III.    Conclusion and Order

The Court finds that the ALJ applied appropriate legal standards and that substantial credible evidence supported the ALJ's determination that Plaintiff was not disabled.  Accordingly, the Court hereby DENIES Plaintiff's appeal from the administrative decision of the Commissioner

---

[8]  The relevant section is now designated 20 C.F.R. § 1513 (d)(4).

of Social Security.  The Clerk of Court is DIRECTED to enter judgment in favor of the

Commissioner and against Plaintiff.


IT IS SO ORDERED.

**Dated:    June 24, 2011**                    _____/s/ Sandra M. Snyder_____
                                       UNITED STATES MAGISTRATE JUDGE